State v. Flynn.

---

## STATE OF MISSOURI, Respondent, v. FLYNN, Appellant.

St. Louis Court of Appeals, June 5, 1906.

1. **PRIMARY ELECTIONS: Interfering With Voters: Police Officers.** Under the Session Act of 1901, approved March 13, 1901, section 25, subdivision 3, the interference with voters at a primary election, held in cities of over three hundred thousand inhabitants, by pulling them out of line, assaulting them, etc., is a misdemeanor and a police officer employed by the police board of the city of St. Louis, under sections 6212 and 6213,

State v. Flynn.

Revised Statutes of 1899, was charged with the duty of arresting any person who obstructed the voting in that manner at a primary election held in that city.

2. ———: ———: ———: **Arrest Without Warrant.** Where such interference with the voting occurred in the presence of a police officer, it was his duty to make the arrest without warrant.

3. ———: ———: ———: **Violation of Duty.** Under section 2105, Revised Statutes of 1899, a police officer of the city of St. Louis, who saw interference with the voting at a primary election and failed to prevent such interference by arresting the offenders or otherwise, was guilty of a misdemeanor.

4. ———: ———: ———: ———: **Corrupt Motive.** In the prosecution of a police officer for neglect of duty in failing to prevent the interference with voters at a primary election in a city of over three hundred thousand inhabitants, it is necessary for the indictment to aver that the violation of duty was corruptly committed.

5. ———: **Judicial Notice.** A court will take judicial notice of the fact that the Democratic party cast more than 10,000 votes in Missouri at the election held in 1902, so that that party had a right to hold a primary election under the act of 1901 relating to primary elections in cities of over three hundred thousand inhabitants.

Appeal from St. Louis Court of Criminal Correction.—
*Hon. Hiram N. Moore,* Judge.

REVERSED.

*T. J. Rowe* for appellant.

Defendant's demurrer to the indictment should have been sustained. (a) The alleged neglect of duty must be shown to be corrupt. Section 2105, R. S. 1899; State v. Gardner, 2 Mo. 23; State v. Hein, 50 Ibid 362; State v. Pinger, 57 Ibid 243; State v. Grassle, 74 Mo. App. 313; Smith v. Sing, 68 Cal. 324; Tripplett v. Numter, 50 Cal. 645. (b) The indictment is multifarious and bad for that reason. 1 Bishop's New Crim. Proc. (4 Ed.), sec. 432; State v. Jamison, 90 N. W. 622; People v. Flaherty,

57 N. E. 73; People v. Williams, 65 Pac. 323; State v. Healy, 50 Mo. App. 243; State v. Harrison, 62 Ibid 112; State v. Fox, 148 Mo. 517, 50 S. W. 98; State v. Boyd, — Mo. —.  (c)  It is not the duty of a police officer to prevent persons from interfering with voters at a primary election, and it is self-evident that he is powerless to prevent interference.  The law does not prescribe the duty as alleged in the indictment.  The police officer has power to act only after the offense has been committed. Until Lavin McAuliffe and the unknown persons had violated the law, defendant could not take any action toward them.  A police officer cannot prevent the commission of a crime, but he can arrest the person or persons guilty of a crime, and that is the only duty imposed upon him by law.  (d)  The indictment states no facts showing a neglect of duty.  State v. Burke, 151 Mo. 152, 52 S. W. 226; U. S. v. Hess, 124 U. S. 483.

*Charles P. Williams* for respondent.

(1)  The law of the case.  R. S. 1899, sec. 2105; Penal Code of New York, secs. 117 and 154; R. S. 1899, secs. 6212, 6213 and 6232; Session Acts 1901, title "Elections."  (2)  The statutes impose a duty upon the individual policeman.  State v. Grant, 76 Mo. 236; State v. Holcomb, 86 Mo. 380; State v. Hancock, 73 Mo. App. 19; People v. Diamond, 76 N. Y. Supp. 57.  (3)  If the statute did not command, the common law would.  1 Russell on Crimes, 416; 1 Bishop's New Crim. Law, sec. 239; Rex v. Wyat, 1 Salkeld 380; State v. Kern, 51 N. J. Law 265; Wharton's Crim. Law (10 Ed.), sec. 14; State v. Reuben Rose, 32 Mo. 560.  (4)  The statute has been decided to apply, by this court.  State v. Boyd, — Mo. —; People v. Herlihy, 73 N. Y. Supp. 236; s. c., 170 N. Y. 584; People v. Diamond, 76 N. Y. Supp. 57. (5)  The allegation "corrupt" is unnecessary.  Black's Law Dictionary, S. V.; Anderson's Law Dictionary, S.

State v. Flynn.

V.; State v. Stein, 48 Minn. 466; New York Penal Code, sec. 718; California Penal Code, sec. 7, cl. 3; Minn. Gen. Stat., sec. 6842, cl. 2; Montana Penal Code, sec. 7, cl. 4; Rev. Stat. Utah, sec. 4053; Rev. Stat. Okla., sec. 2688; State v. Ragsdale, 59 Mo. App. 603; 2 Chitty's Crim. Law, star pages 175, 179, 181, 244, 249, 253, 254, 256, 260, 261 263; vol. 3 star page 588; 2 Wharton's Precedents; Rex v. Bootie, 2 Burr. 864; Rex v. Holland, 5 D. & E. 623; Rex v. Saintsbury, 4 D. & E. 457; Rex v. Antrobus, 2 Ad. and El.; Rex v. Pinney, 3 Barn & Ad. 957; Rex v. Hann, 3 Burr. 1716; Rex v. Williams, 3 Burr. 1317; Rex v. Bayliss, 3 Burr. 1318; King v. Brooke, 1 D. & E. 190; King v. Justices, 1 W. Bl. 432; Rex v. Jackson, 1 D. & E. 653; People v. Norton, 7 Barbour 479; State v. Buxton, 2 Swan 57; People v. Brooks, 1 Denio 457; State v. Hatch, 116 N. C. 1003; Gardner v. People, 62 N. Y. 299; Com. v. Coyle, 160 Pa. State. 36. (6) The indictment is not duplicitous. · Stows v. State, 3 Mo. 9; State v. Kesslering, 12 Mo. 565; State v. Fletcher, 18 Mo. 425; State v. McGrath, 73 Mo. 186; State v. Heinze, 45 Mo. App. 403; State v. Stephens, 70 Mo. App. 563; People v. Herlihy, 73 N. Y. Supp. 236; United States v. Scott, 74 Fed. 213; Busby v. State, 77 Ala. 66; State v. Meyers, 20 Mo. 411; Sprouse v. Commonwealth, 81 Va. 374; Beasly v. State, 59 Ala. 23; Boland v. People, 25 Hun 423; State v. Rambo, 95 Mo. 462, 8 S. W. 365; Reg. v. Bleasdale, 2 Car. & K. 765. (7) The court judicially knows the democratic party casts ten thousand votes in this State, and the statute itself recognizes it. State ex rel. v. Bland, 144 Mo. 552, 46 S. W. 440; In re Denny, 51 L. R. A. 722.

STATEMENT.—The defendant, who was heretofore a policeman and on the police force of the city of St. Louis, appeals from a conviction for neglect of official duty. On March 12, 1904, a primary election to choose delegates to the state convention of the Democratic party of the

State of Missouri, was held in the city of St. Louis and, among other places, in said city at the first voting precinct in the Twenty-eighth ward. The defendant Flynn had been detailed and assigned to perform the duties of a police officer at the polling place of said precinct while the primary election was in progress. The indictment charges in substance that it was Flynn's duty to preserve the peace at said primary election and prevent any one from obstructing voters who were seeking to exercise the right of voting; that then and there in the immediate presence and view of said Flynn, John Lavin and John McAuliffe, and other persons whose names were to the grand jury unknown, unlawfully interfered with and obstructed certain named citizens who were then and there voters, and were entitled to vote at said election and who were lawfully exercising such right. The indictment names twenty-four citizens and voters who were obstructed and interfered with (to-wit; J. D. P. Francis, D. R. Francis, Jr., Edward Cunningham Jr., and others) and states that they were all qualified voters in the ward and had duly registered as such; that the interference with and obstruction of said voters by Lavin, McAuliffe, and other persons unknown, were committed by assaulting the said qualified voters, intimidating them, pushing them from the line and position of voters at the polling place, and placing other persons in front and between said persons for the purpose of preventing said voters from entering the polling place and casting their votes. The indictment further charged that Flynn, while acting as a police officer and witnessing "said unlawful conduct and interference with and obstruction of the aforesaid qualified voters by the aforesaid John Lavin, John McAuliffe, and others, did then and there unlawfully and willfully permit and neglect to prevent the aforesaid unlawful interference with the obstruction of the qualified voters aforesaid, in the manner aforesaid, by the said John Lavin and John McAuliffe

and others; he the said Tim Flynn as such police officer aforesaid, having then and there the power, authority and means at his hands to prevent the aforesaid unlawful interference with and obstruction of the voters aforesaid contrary to the statute in such case made and provided and against the peace and dignity of the State." The indictment was demurred to on the ground that the legislative act of March 13, 1901, entitled "Primary Election Laws," was unconstitutional, and as the indictment was founded on said act, no offense was charged; that the indictment was duplicitous, multifarious and combined two or more offenses in the same count. The demurrer was overruled. The case went to trial before a jury, a verdict of guilty was returned against the defendant and his punishment assessed at six months in jail and a fine of $250. After the necessary motions, an appeal was taken to this court.

The polling place was on a vacant lot at the southwest corner of Taylor and Delmar avenues on the west side of Taylor and about one hundred feet south of Delmar. The disturbances out of which the indictment of the defendant grew occurred toward the close of the afternoon and between the hours of five and seven o'clock. At that time the voters waiting for their turns and an opportunity to get into the polling booth, constituted a line about one hundred feet long, stretching north from the door of the booth toward Delmar avenue. Each intending voter occupied about a foot of space; so there were about one hundred voters in line. The testimony for the State goes to show that a band of ruffians who did not belong in the ward and were not entitled to vote at that polling place, would shove or drag the voters from their positions in the line now and then, and assault and beat them. Several citizens were badly hurt by the assaults and one, at least, Mr. Willard R. Hall, was beaten into insensibility. D. R. Francis, Jr., just as he was about to enter the booth, was pushed out of the line and

a fight ensued. Said Francis and his brother finally succeeded in entering the booth and voting. Joseph Kirkbride, who was standing in line, was knocked down and then stepped on and kicked. Theodore Bland, after waiting in the line from 5:30 to 6:15. o'clock, within thirty or forty feet of the booth, was pulled out of the line, jerked, struck two or three times and then thrown into the gutter and kicked. Mr. Willard R. Hall was thrown out of the line two or three times but got back again; was finally dragged out, struck on the nose, kicked on the shins and left unconscious. There was testimony that when the waiting voters were pushed out of line others would be substituted by the assaulting gang, the purpose being to control the vote. There was much testimony that the defendant Flynn was standing by the line of voters and witnessed these assaults and outrages, but did nothing to quell the disturbances or protect the rights of the citizens, though he was appealed to for protection time and again. Witnesses swore he threatened to arrest the citizens who asked protection instead of heeding their request.

For the defendant the testimony went to show that some of the voters in the line created the disturbances themselves, and were to blame for the affrays; that Flynn did not witness any of the affrays and was not called on to make any arrests or for protection; that he did arrest one person and took him away; that he rescued D. R. Francis, Jr., or assisted him when he was in a fight with four or five men; that MacCormack, who testified to appealing to Flynn for protection, was really taunting him (Flynn), saying that Flynn was not there for the protection of the voters, but to aid the crowd of ruffians who were causing disturbances; that on account of these taunts Flynn threatened to arrest him. The testimony for the defense went to show that Flynn did his duty and did not refuse to make arrests or fail to protect quiet men who were molested. The defendant

himself testified that he got to the polling place about one o'clock, before the polls were open; other officers were there; a dispute arose over a fireman claiming to vote ahead of his time; this was settled without an affray by argument; that C. B. MacCormack kept saying to the crowd: "It's no use calling the police officer's attention; he won't look at it." That finally witness said to Mac-Cormick that if he did not hush he would arrest him. Witness testified that he saw no assaults at any time, nor any one knocked down; that he saw one young man running away and heard others yell; "Get him." Witness testified to going to the relief of Mr. Francis when he was in a fight; that he did not see the assault on Hall and knew nothing of it; that nobody called on witness to make an arrest or for protection. The general effect of the defendant's testimony was that he saw no occasion to make an arrest and did his duty during the entire afternoon; that the witnesses for the State were certainly mistaken in saying that he (defendant) was called on to make arrests or for protection and failed to respond. He swore that none of the witnesses who testified to invoking his help had in fact spoken to him, and must have mistaken him for some other officer.

At the conclusion of the evidence the court gave instructions which fully and accurately covered the case. The main instruction will be copied; omitting the list of voters who were interfered with, except the one first named:

"The court instructs the jury that if they find and believe from the evidence that on the twelfth day of March, 1904, at the city of St. Louis, and in the State of Missouri, and in the Twenty-eighth ward of said city, and in the First voting district of said ward, there was held a primary election for the purpose of choosing and selecting delegates to the State Democratic Convention of the State of Missouri, to be held on the nineteenth day of July, 1904, and that on said twelfth day of

March, 1904, one Timothy Flynn was duly appointed, commissioned and acting police officer of said city, and as such was detailed and assigned to duty at the polling place in said city, ward and district for the purpose of preserving the peace at said primary election and to prevent any one in any manner interfering with or obstructing such voters as might then and there by lawfully exercising or seeking to exercise the right of voting at said primary election, and that then and there D. R. Francis, Jr. (etc., etc.), were duly qualified voters, as hereinafter defined, and were at said time and place lawfully exercising or seeking to exercise the right of voting at said election and while so exercising or seeking to exercise said right, and in the immediate view and presence of the defendant, one John Lavin, or John McAuliffe, or others, did interfere with or obstruct said Francis (etc., etc.), in the exercise or attempted exercise of the right of voting by assaulting, intimidating, and pushing said voters from the line and position of voters at the polling place aforesaid and by forcibly placing and putting other persons in front of and between the said voters and the said polling place, for the purpose and with the intent to prevent said Francis (etc. etc.), from entering the said polling place and casting their votes, and that then and there the defendant, as such police officer, had the power, authority and means at his hands to prevent the aforesaid interference with the obstruction of said voters in the exercise of attempt to exercise their right to vote, if you find that the said Francis (etc., etc.) was so interfered with and obstructed, and that the defendant did then and there unlawfully and willfully permit and neglect to prevent the aforesaid interference with and obstruction of said voters as aforesaid, then you will find the defendant guilty and assess his punishment at a fine not exceeding five hundred dollars, or by imprisonment in the city jail, or the city workhouse, not exceeding one year, or by both

such fine and imprisonment. And, unless you find the facts as above set forth so to be, you will find the defendant not guilty."

The court gave instructions defining who was meant by a qualified voter and what was meant by the term "unlawfully and willfully;" that the indicment was no evidence of the defendant's guilt; that the defendant was a competent witness in his own behalf, but the interest he had in the case might be considered by the jury in determining the credibility of his testimony; that he was presumed to be innocent until his guilt was established by evidence beyond a reasonable doubt; that if, upon consideration of all the evidence, the jury had a reasonable doubt, it was their duty to acquit; that the previous good character of the defendant, if proved, should be considered in passing on his guilt or innocence, as the law presumes that one of good character is less likely to commit a crime than one whose character was not good; that the jury was the sole judge of the credibility of the witnesses and the weight to be given to the evidence. Besides these general and customary instructions the court granted this instruction:

"If you find and believe from the evidence that said assaults or interference with said voters occurred, but that the same did not occur in the immediate view and presence of the defendant, or that the same did occur in the view and presence of the defendant but that the defendant did not then and there have the power, authority or means at his hands to prevent the same, then you should find the defendant not guilty."

GOODE, J. (after stating the facts).—We have given an elaborate statement of the facts of this case because, though it is a conviction for a misdemeanor, the alleged misconduct of the defendant was one which vitally concerns the welfare of the community and the

rights of its citizens. The indictment rests on this section of the statutes:

"Every officer or person holding any trust or appointment, who shall be convicted of any willful misconduct or misdemeanor in office, or neglect to preform any duty enjoined on him by law, where no special provision is made for the punishment of such misdemeanor, misconduct or negligence, shall be punished by fine not exceeding five hundred dollars, or by imprisonment in the county jail not exceeding one year, or by both such fine and imprisonment." [R. S. 1899, sec. 2105.]

Beyond question the evidence tended to sustain the allegations of the indictment. That qualified voters who were waiting in line at the polling place to cast their ballots were interfered with and obstructed in that duty, driven out of line and others put in their places, and they subjected to violent and well-nigh felonious assaults, is a conclusion fairly to be drawn from the testimony. So is the conclusion that the defendant stood by and witnessed those outrages without arresting the perpetrators, interfering for the protection of the wronged citizens, attempting to keep the public peace or in any way asserting his authority as a police officer. We are not to be understood as passing on the merits of the case and deciding that the defendant's guilt was established. There was strong testimony in his favor, going to show he did his entire duty and was not delinquent in any respect. What we say is that the jury's verdict of guilty is supported by abundant evidence. It goes without saying that if a police officer charged with the duty of keeping the peace and protecting citizens while exercising the right of suffrage, permits rioters to assault peaceable men and drive them from the pools, he is guilty of culpable neglect of duty, unless he is powerless to prevent the crimes. The statutes in regard to primary elections in cities of 300,000 inhabitants and over, create certain misdemeanors in connection with primary elections. Among

other things it is provided that any person who in
any manner interferes · with· the officers holding any
primary election or conducting the canvass of votes
cast thereat, or with voters lawfully exercising or
seeking to exercise their right of voting at such
primary elections "shall be deemed guilty of a
misdemeanor (Session Acts 1901, section 25, sub-
division 3, p. 1644; approved March 13 1901). ·The
men who pulled voters out of line at the polling place in
the Twenty-eighth ward, assaulted them and put others
in their places, flagrantly violated the above statute. Now
if those offenses were committed in sight of the defend-
ant, while he was there as a police officer, it was certainly
his duty to interfere when called on for protection by
quiet citizens.   We have other statutes providing that it
shall be the duty of police boards to preserve the public
peace, prevent crime, arrest offenders and preserve order
at every public election, and at all public meetings and
places.   To enable the boards to discharge these duties
they are empowered to employ a roll of permanent police
officers.   [Secs. 6212, 6213, R. S. 1899.]   It is provided,
too, by the statutes, that every police officer in the city
of St. Louis is a State officer.   [Sec. 6232, R. S. 1899.]

In view of the above legislation there can be no
doubt, we think, that it was the duty of the defendant
to arrest persons who obstructed the voting at the poll-
ing place in question by assaulting the voters.   Accord-
ing to the witnesses for the State, the offenses were com-
mitted in defendant's view; and, if so, he could have
arrested the offenders without warrants.   [State v.
Grant, 76 Mo. 236; State v. Hancock, 73 Mo. App. 19.]
From ancient times the law has been that sheriffs, con-
stables and other police officers have authority to pre-
vent riots, keep the peace and arrest persons who raise
riots and affrays, and are punishable on indictment for
willfully refusing to do so.   [2 Wharton, Criminal Law
(10 Ed.), sec. 282; Rex v. Pinney, 5 C. P. 254; Rex v.

Kennett, Id., 282; Reg v. Neale, 9 C. & P. 431.] To the first of those cases is appended a note which goes extensively into the question under advisement. The conditions depicted by the witnesses for the State in the present case, show that a band of rioters were engaged in law-breaking at the polling place in the Twenty-eighth ward for the purpose of intimidating voters and preventing a fair election, with the ultimate design of having a majority returned at that poll for delegates who were preferred by the rioters. Various assaults and outrages were perpetrated to accomplish this unlawful end, the witnesses say, in defendant's sight and observed with such indifference on his part, and such threatening responses to those who appealed to him for protection, as strongly incline to prove he was in sympathy with and conniving at the offenses. In the cases last cited it was ruled, in effect, that a police officer of whatever grade, who does not, in emergencies such as were presented to the defendant, exercise reasonable authority, firmness, courage and activity to suppress law-breakers, is himself guilty of an offense. No doubt a police officer is granted a discretion about making an arrest or otherwise using his authority; but this discretion will not exonerate him from criminal responsibility for omitting to arrest rioters who commit crimes before his very eyes; especially when his assistance is invoked by peaceable citizens who are the victims of the outrages. There was no room for a finding that defendant abstained from interference because, in his judgment, the public welfare would be better subserved by that course, if the jury found the offenses were committed in defendant's sight and he had the power to prevent them but refused to do so. An officer is not to be blamed for failing to do more than reasonably could be expected of hm. His activity to keep the peace in a given instance must be in proportion to his ability, the circumstances considered, to deal with the disturbers. The defendant's rights in all these re-

gards were recognized and guarded in the instructions. The jury was advised that if the alleged assaults on voters occurred, but not in his immediate view, or if they occurred in his immediate view and presence but he did not have the power, authority and means at his hands to prevent them, the jury should find him not guilty. In truth no point was made about the defendant's authority to arrest offenders and prevent their interference with voters, or that he refused to do so because he lacked power, or because, in his discretion, he deemed it wise to overlook the unlawful occurrences. The defense was that he saw no offenses committed of the sort described by the State's witnesses, but only some trifling altercations among the voters themselves, which he interfered with as far as was necessary. There was a clear conflict between the witnesses regarding the facts, and the jury had to weigh the evidence to determine what the truth was.

It is contended that, granting defendant refused to make arrests, or to prevent unlawful interference with voters, when he could and ought to have done so, there was no allegation or proof that his conduct was corrupt. No evidence was introduced to prove it was in the sense that it was induced by bribes or hope of gain; but, in our opinion, the evidence for the State justified the conclusion that his conduct was corrupt in the sense that, from some unworthy reason, he willfully refused to perform a plain duty which called urgently for performance. But the vital question in this connection is whether it was necessary for the indictment to aver that he acted corruptly and the instructions to require a finding that he did. We hold that such an allegation and finding were not essential and think the authorities support us. Cases are cited construing the statute on which the present indictment is founded, which held indictments bad for lack of an averment that the breaches of official duty charged were committed corruptly. [State v. Gardner, 2 Mo. 23;

State v. Newkirk, 49 Mo. 85; State v. Hein, 50 Mo. 362; State v. Pinger, 57 Mo. 243; State v. Kite, 81 Mo. 97; State v. Grassle, 74 Mo. App. 313.] Each of those prosecutions was for misconduct in the performance of official duty of a judicial character and where the very essence of the offense was a corrupt motive; as there was a discretion lodged in the official and opinions might differ about the propriety of the alleged wrongful act unless it was corruptly done. Those cases have all been reviewed judicially and the scope of the doctrine they announce defined. [State v. Ragsdale, 59 Mo. App. 590.] The rule that a corrupt motive must be alleged and proved, applies where the misconduct related to judicial or quasi-judicial duty. In cases where the rule was applied, the reasoning of the opinions and the authorities cited, show it pertains only to acts which, in the nature of things, would not be criminal unless they were inspired by a corrupt intent; and this was the view adopted in State v. Ragsdale. That case was a prosecution of the mayor of a city for oppression in office and was founded on the same statute involved in this prosecution. The information accused the mayor of having acted corruptly; but the trial court refused to charge the jury that they must find he corruptly, knowingly and willfully, was guilty of oppression in office. The court struck the word "corruptly" out of the instructions. At common law indictments of judicial officers for misconduct in the performance of duty were always required to charge they acted corruptly. The ancient and modern precedents, and the forms of criminal pleadings given by approved textwriters, conform to that rule. On the other hand indictments for official misconduct in the performance of executive and ministerial duties usually do not contain an averment that the misfeasance was corrupt; and many convictions have been sustained without an averment or proof of that kind, though the point was distinctly made that it was necessary. [Rex v. Holland, 5 D. & E. 607,

623; Rex v. Saintsbury, 4 D. & E. 451, 457; Rex v. Pinney 5 C. & P. 254; People v. Norton, 7 Parb. 477, 479; State v. Bixon, 2 Swan 57; People v. Brooks, 1 Denio 457; State v. Hatch, 116 N. C. 1003.] The underlying principle of the distinction appears to be that when the official act complained of is of doubtful legality, and the official enjoyed a discretion in the performance of his duties, he cannot be convicted of acting wrongly unless he acted corruptly. But when the illegalty of the act is palpable, then willful and intentional delinquency on the part of an official, whether it be a non-feasance or a mis-feasance, is indictable even though his motive was not corrupt in the sense that he sought personal profit. We have already indicated sufficiently that affairs at the polling place in the Twenty-eighth ward at the time in question obviously demanded action by the defendant in the interest of the public peace and the rights of citizens. If he witnessed repeated infractions of the law of the kind in proof and had the force at hand to cope with the malefactors, he laid himself open to punishment by refusing to do anything.

The indictment is said to be duplicitous in that it charges several distinct offenses. It charges only one offense and that is that certain named citizens were unlawfully obstructed while waiting to vote and the defendant stood by and saw this done without going to their assistance. It is true the indictment details the manner in which the voters were molested, namely; by being pushed out of line and assaulted; but the offense charged is that defendant permitted the voters to be interfered with and obstructed.

It is further said that no proof was introduced that the Democratic party cast 10,000 votes at the election in November, 1902, prior to the primary election in question, and hence it was not shown that said party had any right to hold a primary election. The statute classes as political parties which are entitled to hold elections un-

der the Primary Election Law in cities having 300,000 inhabitants or more, those political organizations which cast 10,000 votes for Governor or Supreme Judge at the last election. This court can take judicial notice that the Democratic party cast more than 10,000 votes in Missouri at the election in 1902. [In re Denny, 51 L. R. A. (Ind.) 722.]

The foregoing observations give the conclusions reached by this court regarding the legal propositions in the present case. The opinion was prepared prior to the decision by the Supreme Court of the case of State v. Boyd, —— Mo. ——. That case was an indictment against defendant Boyd, who was a member of the St. Louis police force, for misconduct in office, to-wit; the willful and knowing neglect of an official duty. The Supreme Court in a carefully considered opinion, expressly decided that such an indictment was fatally defective if it did not contain an averment, not only that the violation of an official duty was knowingly and willfuly committed, but also that it was *corruptly* committed. According to that determination by the court of last resort in this State, the indictment in the present case is fatally defective and, therefore, we reverse the judgment. All concur.